## LIPSCHITZ v. NAPA FRUIT CO.

(Circuit Court of Appeals, Second Circuit.   April 13, 1915.) ·

No. 194.

1. COURTS ⬥⟳312—JURISDICTION OF FEDERAL COURTS—SUITS BY ASSIGNEES.

Under Judicial Code (Act March 3, 1911, c. 231) § 24 (1), 36 Stat. 1091 (Comp. St. 1913, § 991), which provides that no District Court shall have cognizance of any suit (except upon foreign bills of exchange) to recover on a promissory note or other chose in action in favor of an assignee "unless such suit might have been prosecuted in such court to recover upon such note or other chose in action if no assignment had been made," where the requisite diversity of citizenship exists between the parties to such a suit, jurisdiction depends on whether it could have been maintained in that court as between the original parties to the instrument, and the citizenship of intermediate assignees is immaterial.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 865–875; Dec. Dig. ⬥⟳312.]

2. TRIAL ⬥⟳236—INSTRUCTIONS—FACTS IMPEACHING PARTY AS WITNESS.

Where a defendant in his verified answer explicitly denied allegations of the complaint which he admitted on the trial, among others the execution of the contract sued on, and defendant was a witness in his own behalf, it was not error for the court in its charge to call the attention of the jury to such fact.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 531–533; Dec. Dig. ⬥⟳236.]

3. CONTRACTS ⬥⟳163—CONSTRUCTION—CONFLICT BETWEEN WRITTEN AND PRINTED CLAUSES.

Where there are inconsistent provisions in a contract, one being written in, and the other part of a printed form, the written provisions (certainly in the absence of any proof of the contrary) will be assumed to express the intent of the parties.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 745; Dec. Dig. ⬥⟳163.]

4. SALES ⬥⟳350—REMEDIES OF SELLER—ACTION FOR PURCHASE PRICE.

Plaintiff contracted to sell to defendant 1,500 boxes of prunes, to be shipped by water from California to New York.   Payment was to be made by defendant 10 days after shipment, on presentation of draft with bill of lading, etc., attached.   The parties knew that the prunes could not arrive inside of 3 weeks.   Held that, under Sales of Goods Act (Laws N. Y. 1911, c. 571) § 144, subds. 1, 2, which provides that "where, under a contract to sell or a sale, the price is payable on a day certain, irrespective of delivery or of transfer of title, and the buyer wrongfully neglects or refuses to pay such price, the seller may maintain an action for the price, although the property in the goods has not passed, and the goods have not been appropriated to the contract," on defendant's refusal to pay the draft when duly presented, plaintiff could maintain an action for the price, although it was named as consignee in the bill of lading and the title to the goods had therefore not passed.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 988–992; Dec. Dig. ⬥⟳350.]

In Error to the District Court of the United States for the Southern District of New York.

This cause comes here on a judgment entered on May 11, 1914, in favor of the defendant in error for the sum of $3,760.13.   The plaintiff in error was defendant below, and is hereinafter referred to as defend-

ant. The defendant in error was plaintiff below, and is hereinafter referred to as plaintiff.

Boudin & Liebman, of New York City (Louis B. Boudin, of New York City, of counsel), for plaintiff in error.

Allen C. Bragaw, of New York City (Albert W. Meisel, of New York City, of counsel), for defendant in error.

Before LACOMBE, WARD, and ROGERS, Circuit Judges

ROGERS, Circuit Judge. This is an action upon a contract for the sale of prunes. The plaintiff sold to defendant 4,500 boxes of Clover Blossom prunes, which were to be shipped in accordance with the terms of a certain contract. It was denied in the answer, but admitted at the trial, that 3,000 of these boxes were delivered to defendant, and accepted and paid for by him, in accordance with the terms of the agreement. But the claim of plaintiff as to the remaining 1,500 boxes was that it tendered them to defendant on various occasions in New York in accordance with the terms of the contract, and that defendant in violation of the contract refused to accept the same, and thereupon plaintiff stored them in a warehouse in New York, subject to defendant's order, and brought this action to recover the sum of $3,234.36, with interest from January 10, 1912.

The evidence showed that in the sale of California dried fruits two forms of contract were used, which differed in their terms. One provided for shipment by rail and the other by water. The form used in rail shipments provided as follows:

"If shipment is not accepted or disapproved within three full business days after arrival, and goods are subject to buyer's privilege of examination, contract shall be considered fully complied with on seller's part, and invoice, if unpaid, becomes immediately due and payable. (Note: In the event of the shipment being inaccessible on arrival seller or seller's agent should be notified within said three days.)"

And the form used in water shipments provided as follows:

"In view of the recognized increased hazard of water shipment, due to climate and other conditions, buyer hereby expressly assumes all risks after examination by an official inspector of the Dried Fruit Association of California, and issuance by him of an Association certificate as to quality (and in the case of prunes count), and issuance by seller of a sworn certificate of weight. Cost of inspection to be paid by seller."

The contract under which the transaction in question was entered upon was a water shipment contract containing the provision last quoted, although defendant urged upon the court that, if there existed a contract at all, it was a rail shipment contract which contained the first of the above-quoted provisions. Under a contract for water shipment the prunes were accepted in California and were to be paid for on presentation of the draft within 10 days from date of shipment, which was about 3 weeks previous to the arrival of the goods under ordinary conditions. The certificate of inspection on the coast was made, as seen in the provision cited, a final acceptance of the goods.

The plaintiff forwarded for collection to the Chase National Bank of New York a draft drawn by it on defendant for the sum of $3,167.67. This draft was dated December 27, 1911, and was payable 10

days after date to the order of the First National Bank of Napa, and had marked thereon "Invoice No. 1540." The head of the collection department of the bank testified that the draft was presented to defendant for payment and payment was refused. Under the contract the draft should have been accompanied by the bill of lading, a certificate of weight, and a certificate of inspection. The bank messenger who presented the draft testified that these documents were attached to the draft when he presented it for payment. The fruit broker who had charge of the matter for plaintiff states that between March and August, 1912, he had a good many conversations with defendant about the payment of the draft. He testified:

"I repeatedly asked him when he would pay the draft, and he kept saying that he couldn't pay it at that time, because he didn't have the money, but just as soon as he got rid of some of the goods he had in warehouse he would take up the drafts. That was the only reason he gave for not wanting to pay that draft. I had conversations with him every week; in fact, almost every day or so. Our offices are in the same district, right across the street from his. I would meet him on the street 15 times a day, or in our office, and this was a very natural topic of conversation."

He also testified that the bank, after defendant refused payment of the draft and the prunes were released to his firm, turned over at the same time the draft, and the certificate of weight, the certificate of count, and the certificate of inspection.

The defendant claims that the complaint should have been dismissed because: (1) The court had no jurisdiction; (2) because plaintiff failed to prove that attached to the draft was a sworn certificate of weight; (3) that there was no proof of a contract definite in terms; (4) that under the Uniform Sales Act, which is part of the law of the state of New York and of this jurisdiction, the only form of action the plaintiff could bring was an action for damages and not for the purchase price.

[1] As the jurisdiction of the court is challenged, that question must be first determined. The plaintiff is a California corporation, and the defendant is a citizen of the state of New York. This diversity of citizenship gives the court jurisdiction, unless the circumstances of the case are such as to take it out of the general rule. It appears that prior to the commencement of this action the plaintiff assigned the cause of action to one Oskar Bergh, a citizen of the state of New York. Thereupon Bergh sued defendant on this cause of action in one of the courts of the state of New York. This action subsequently was discontinued by stipulation, and it was stated therein that the action was discontinued without prejudice to the right to maintain the action in another court. Bergh thereafter reassigned the claim to plaintiff. It is undisputed that Bergh could not have brought the suit in the federal courts, he and the defendant both being citizens of the state of New York. The defendant therefore insists that, as the plaintiff's assignor could not have maintained the suit in the federal court, the assignee is equally precluded. The provision specifically precluding such assignees bringing their suits in the federal courts was included in the first Judiciary Act enacted in 1789, and has been the

law of the land ever since. The provision is part of section 24 of the Judicial Code now in force and reads as follows:

"No District Court shall have cognizance of any suit (except upon foreign bills of exchange) to recover upon any promissory note or other chose in action in favor of any assignee, or of any subsequent holder if such instrument be payable to bearer * * * *unless such* suit might have been prosecuted in such court to recover upon said note or other chose in action if no assignment had been made." Judicial Code (Act March 3, 1911), § 24, subd. 1.

The intent of the statute was to prevent citizens of the same state from creating a diversity of citizenship by assignment, and from thereby conferring upon the assignee by indirection a right to sue in the courts of the United States which otherwise he would not have possessed. The jurisdictional requirements under the statute seem to be two:

(1) The original parties to the chose in action sued upon must have been citizens of different states, so that an action might have been maintained in the federal courts had the chose in action never been assigned.

(2) The diversity of citizenship of the original parties to the chose in action must exist at the time the jurisdiction of the court attaches, which is the time when the action is commenced.

In Wilson v. Fisher, Baldw. 133, 30 Fed. Cas. 122, Case No. 17,803 (1830), the facts were these: A citizen of New York had obtained a judgment in a Pennsylvania court against a citizen of Pennsylvania. Before the commencement of the action upon the judgment the New York citizen assigned the judgment to a citizen of Pennsylvania, and the latter's executors assigned it to the complainant. It was argued that, because of the intermediate assignment to the citizen of Pennsylvania, the original diversity of citizenship was lost, and the court lost its jurisdiction. The court thought not, and in the course of its opinion said:

"The question is thus presented whether the assignment mentioned in the act of Congress has reference to that under which the plaintiff claims directly, or to that by which the right was divested out of the party originally entitled to it. The suit cannot be maintained here unless it might have been prosecuted here, if no assignment had been made; that is, as we understand it, if it had remained with the original parties to the transaction, contract or cause of action. The law does not declare that no assignee shall prosecute his suit in this court unless his assignor might have done so; but, unless a recovery of the right claimed might have been had in this court if no assignment of it had been made, and of course in every case in which a recovery might have been prosecuted in the courts of the United States if no assignment had been made, it may be so prosecuted after such assignment to a party competent to sue here."

In Milledollar v. Bell, 17 Fed. Cas. 290, Case No. 9,549, 2 Wall. Jr. 334 (1852), the facts were as follows: This was a foreclosure of a mortgage by a citizen of New York, the mortgagor being a citizen of New Jersey. The plaintiff had title to the mortgage through several intermediate assignments, and the citizenship of none of the assignors was alleged. The court overruled the demurrer to the complaint, and said, through Judge Grier, then a Circuit Judge and afterwards Mr. Justice Grier of the Supreme Court:

"The statute does not take from the assignee of a chose in action his right to sue in the courts of the United States, unless his immediate assignor could have sustained such action; but only in case the court could have had no jurisdiction as between the original parties to the instrument, if no assignment had been made. The situation or rights of temporary intermediate assignees, holders, or indorsers enter not into the conditions of the case. * * * We are of opinion, therefore, that as this bill shows that the complainant is a citizen of New York, and the defendants citizens of New Jersey, at the time the bill was filed, and that the original contractor or mortgagee is a citizen of the same state, and could therefore have sued these defendants, at the time this bill was filed, in the circuit court of New Jersey, 'if no assignment had been made,' this court has jurisdiction of the case, and the citizenship of the intermediate holders, owners, or assignees is immaterial, and need not be averred."

In Montalet v. Murray, 4 Cranch, 46, 2 L. Ed. 545 (1807), an action had been brought in the Circuit Court of the United States for the District of Georgia by a citizen of New York against one Murray to recover upon a promissory note payable to one Cardeaux de la Caye, whose citizenship did not appear in the declaration. The Supreme Court, through Chief Justice Marshall, said that if it did not appear upon the record "that the character of the original parties would support the jurisdiction the objection was fatal under the uniform decisions of the court."

[2] We come now to defendant's second objection, which is that he is not in default because he was entitled to have had presented to him a sworn certificate of weight before he could be required to pay for the goods, and that the evidence does not disclose that such a certificate has ever been presented. There was an issue of fact as to whether the draft, when presented for payment, was accompanied with the sworn certificate of weights, together with the inspector's certificate of quality, as the contract required. In order to maintain the action it was necessary to show that the certificates accompanied the draft. The defendant denied that they accompanied it, and admitted that if they did accompany it there was full performance of the contract on the plaintiff's part. The plaintiff insisted that the certificates were attached at the time the draft was presented for payment, and claimed that the weight certificate had been lost prior to trial. The testimony on the subject was conflicting; but there was testimony presented from which the jury had a right to conclude that these certificates were attached to the draft as the contract required. The jury credited plaintiff's witnesses and discredited the defendant, which, upon perusal of the record as a whole, we do not find surprising. There was evidence of conduct as well as admissions on defendant's part inconsistent with his story that he refused to accept and pay the draft because it was not accompanied by sufficient documents. The court below was not quite accurate in what it said as to a waiver. But we think that what was said on that point was harmless error. The real question was whether defendant's story on the witness stand was a truthful one, and that was for the jury to decide.

The defendant interposed an answer under oath, in which it denied separately, paragraph by paragraph, every averment in the complaint, except the one that plaintiff was a citizen and resident of New York.

It even denied the execution of the contract. The complaint expressly averred that defendant accepted and paid for part of the merchandise covered by the contract. The sworn answer denied this positively and not merely upon information and belief. Nevertheless the trial had just begun when defendant, by his counsel, conceded that he had received two car loads of the prunes shipped according to the contract and had paid for them. The trial judge alluded to this in his charge to the jury and said:

"There is one thing more, Mr. Foreman, that my attention has been called to in looking over these papers, which you are at liberty to consider as bearing upon these questions of fact that I have submitted, and that is the defendant's answer under oath, in which he denies everything."

The defendant assigns as one of the errors of the case the use of this language in the court's charge, and declares that it undoubtedly created great prejudice in the minds of the jury against the defendant, "as it practically branded the defendant as a perjurer, and thereby deprived him of his chance to a fair trial at the hands of this jury." We fail to see why the jury were not entitled to take this matter into consideration, or why the court was not entitled to call it to the jury's attention. The circumstance certainly threw some light on defendant's conception of the obligation of an oath, and was helpful, no doubt, towards the conclusion which the jury reached on the matter of his credibility. When a defendant in his sworn answer denies everything, including facts about the truth of which he cannot have been at all ignorant, he has no reason to complain if a court directs the attention of the jury to it.

We think defendant's objection is untenable that the evidence fails to disclose that the parties made a contract definite in terms and which could be enforced in a court of law. We have found no reason to think that the minds of these parties did not meet, or that an agreement was not reached which was definite and certain.

[3] The contract was made in New York City by a broker representing the plaintiff, and the prunes were to be shipped from California to New York. There had been a number of prior transactions between the parties, and defendant had become familiar with plaintiff's form of contract. The contracts were printed (with blanks) each on a single sheet of paper. On one side of the sheet was the contract proper, to be signed by the parties. It contained the statement that the sale was "on terms and conditions stated on the reverse side of this contract." The signature sides of these two forms were substantially alike, and the differences were in the "conditions" on the reverse side. Thus the rail shipment form contained the provision first above quoted, while the water shipment form contained the second of the provisions quoted.

When plaintiff's local broker filled out the form of the contract in suit, he was temporarily out of water shipment forms, so he used one of the rail shipment forms, writing on it immediately above the signatures the words: "All other conditions to be those embodied in regular water contract, etc." He neglected, however, to strike out of the

printed form the reference to terms and conditions stated on the reverse side. Defendant has argued at great length that in consequence there was either no contract proved, or that the contract was one which included only the rail shipment provisions. We discover no difficulty in construing the document. On its face it is a water shipment contract, for it calls for routing by "American Hawaiian Line—two steamers." Where there are inconsistent provisions in a contract, one provision being written in, the other being part of a printed form, the written provisions (certainly in the absence of any proof to the contrary) will be assumed to express the intent of the parties. Sturm v. Boker, 150 U. S. 312, 326, 327, 14 Sup. Ct. 99, 37 L. Ed. 1093 (1893); Chadsey v. Guion, 97 N. Y. 333 (1884); Loveless v. Thomas, 152 Ill. 479, 38 N. E. 907 (1894); Russell v. Bondie, 51 Mich. 76, 16 N. W. 239 (1883). In the Chadsey Case Chief Judge Ruger said:

"It scarcely needs the citation of authority to support the long-established rule that the printed portions of a contract, when repugnant, must be subordinated to those which are written, and that the latter are presumed, from the circumstance of their special and deliberate insertion by the parties, to embrace the real intent and meaning. Leeds v. Mech. Ins. Co., 8 N. Y. 351; Harper v. Alb. Mut. Ins. Co., 17 N. Y. 194; Harper v. New York City Ins. Co., 22 N. Y. 441."

So, in the case at bar, the conditions which are brought into the contract by the written clause will control whenever they conflict with the conditions which are in the printed form. Moreover the evidence shows that the parties gave this common-sense construction to the document, because two separate shipments under it were forwarded, received, and paid for upon presentation of draft, certificate, and sworn statement of weights.

[4] We come now to consider the last of the more serious objections which defendant has raised in this court, and that is that the plaintiff had no right to sue for the purchase price of the goods. The courts have assumed, in the absence of ground for a contrary supposition, that payment of the purchase price and delivery of the goods are intended to be concurrent acts, and that the obligation of each party to perform is dependent upon the simultaneous performance by the other party. Haskins v. Warren, 115 Mass. 514, 533 (1874); Merrill Furniture Co. v. Hill, 87 Me. 17, 32 Atl. 712 (1894); Lamont v. La Fevre, 96 Mich. 175, 55 N. W. 687 (1893); Chapman v. Lathrop, 6 Cow. (N. Y.) 110, 16 Am. Dec. 433 (1826). But in the case at bar payment was by express provision of the contract to be made ten days after the shipment of the goods, and the parties knew that the merchandise could not arrive until three weeks after shipment. And the general rule undoubtedly is that, if different times are fixed for the payment of the price and the delivery of the goods, the act which is by the contract to be performed first is absolutely due on that day, while the performance which is to take place on a later day is not due unless as a condition precedent the prior performance has been rendered. The rule seems to have been adopted from Lord Holt's opinion in Thorpe v. Thorpe, 12 Mod. 455 (1694). See Harvard Law Review 1906–07, p. 375.

The plaintiff has sued for the purchase price of a car load of prunes. The defendant insists that, assuming plaintiff has a remedy, which he denies, he has brought the wrong action. His argument is that title to the prunes never vested in him, and no delivery of the prunes was ever made to him. Therefore no action for goods sold and delivered can be maintained against him. The action should have been one for breach of contract. He calls attention to the following facts upon which his argument is based: That under the contract the goods were delivered in New York to plaintiff's own order; that the bill of lading was never delivered to the defendant, its delivery being conditional upon the acceptance by the defendant of the draft for the purchase price, and was therefore retained by the bank to which it was sent, subject to the plaintiff's order; that it was subsequently delivered, upon plaintiff's order, to its own agents, who thereupon took the goods in possession, and continued in possession of the same until the trial of the action; and that under such circumstances title never passed.

The bill of lading was issued by the American-Hawaiian Steamship Company to Napa Fruit Company for 1,500 boxes of prunes shipped to the Napa Fruit Company as consignee at New York; and it was marked "Notify S. Lipschitz." Now it is undoubtedly a common-law rule that, if a seller takes a bill of lading in which he is named as consignee, the carrier is a bailee for the seller, not the buyer, and the title is retained. The practice of taking bills of lading in this form has been common for centuries in order to preserve to the seller a hold upon the goods during transit. See Williston on Sales (1909) p. 414, where the cases are collected. The seller, by taking the bill of lading in his own name, was regarded as reserving the jus disponendi, or right of disposal of the goods, which was in fact title.

In North Pennsylvania Railroad Co. v. Commercial Bank of Chicago, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287 (1887), the bill of lading stated that the live stock "consigned to order P. M.," who was the shipper, and it was marked "Notify J. B." at point of destination. And the Supreme Court held that the carrier was liable for delivering the live stock to J. B.

But the form of the bill of lading is not in all cases conclusive. In Williston on Sales it is said, in section 284:

"It is to be observed that, though the form in which the bill of lading is taken is indicative of the title to the goods shipped, in the nature of the case, it cannot always be conclusive. * * * If it be supposed, however, that the circumstances are such that, were it not for the form of the bill of lading, the property would have passed, but the seller is named as consignee in the bill, an interesting situation is presented. The object of the seller in reserving the property is, it may safely be assumed, simply to secure himself in regard to the performance by the buyer of the latter's obligations. By shipping the goods the seller has lost all use of them and has definitely appropriated them to his bargain with the buyer. If the shipper could be perfectly sure that the buyer would fulfill his obligation, it can hardly be doubted that he would have made a straight consignment to the latter. The effect of naming himself as consignee in the bill of lading should not be greater than is necessary to effectuate the purpose of the parties. This purpose is to reserve the property for security only—the same purpose that the seller of goods under a conditional sale has; the same purpose that a mortgagee who takes title under a common-law mortgage has."

And in Burdick on Sales (3d Ed.) 1913, § 111, p. 81, that writer states the law as follows:

"The inference of the reservation of title from the form of the bill of lading is not conclusive, but may be rebutted by other evidence. Accordingly, if the seller indorses such bill of lading as above described and sends it to the purchaser, or if he takes the bill of lading in this form for some collateral purpose, such as protecting himself in case the purchaser does not accept the goods, * * * title may pass to the purchaser notwithstanding the form of the bill of lading."

But we need not consider whether at the common law the title to the goods under this bill of lading was reserved to the seller for purposes of security only, so that the buyer had a kind of equitable title, and could be sued for the purchase price, or could maintain an action for the recovery of the possession. No such question or questions are involved.

The case has been argued upon both sides upon the assumption that whatever contract existed between these parties was subject to the New York Sales of Goods Act, which went into effect on September 1, 1911 (Laws 1911, c. 248). We shall therefore decide the questions involved upon the theory that the contract is a New York contract. The defendant directs attention to article 7, section 226, subdivision "b," of the act, which reads that:

"Where the goods are shipped," and by the bill of lading "the goods are deliverable to the seller or his agent, or to the order of the seller or his agent, the seller thereby reserves the property in the goods."

And he deduces from this that, as the property was thus reserved to the seller, the only cause of action the plaintiff could possibly have upon defendant's refusal to accept and pay for the goods was one for breach of contract. The plaintiff, however, relies upon the remainder of subdivision "b," which reads as follows:

"But if, except for the form of the bill, the property would have passed to the buyer on shipment of the goods, the seller's property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligations under the contract."

And he calls attention to section 144 of the act (Laws 1911, c. 571), subdivision 2 which reads as follows:

"Where, under a contract to sell or a sale, the price is payable on a day certain, irrespective of delivery or of transfer of title, and the buyer wrongfully neglects or refuses to pay such price, the seller may maintain an action for the price, although the property in the goods has not passed, and the goods have not been appropriated to the contract. But it shall be a defense to such an action that the seller at any time before judgment in such action has manifested an inability to perform the contract or the sale on his part or an intention not to perform it."

A consideration of the provisions of the act satisfies us that, while the title to the goods in question remained in the seller, the reservation was solely for the purpose of securing performance by the buyer of his obligations, and that the act gives to the seller the right to maintain an action for the price, although the property in the goods had not passed.

There are a number of other assignments of error, but we do not deem it necessary to enter upon a discussion of them. We think the

case was fairly tried, and that there is nothing in the record which justly entitles the defendant to have the judgment reversed.

Judgment affirmed.