## GILBERT GROCERY CO., Inc., v. HOWELL et al.

(Circuit Court of Appeals, Fourth Circuit. May 17, 1923.)

No. 2085.

**1. Sales ⊜⇒22(3)—Recognition of contract binding on defendant buyer.**

Where, on receipt of defendant's order for sugar, plaintiffs returned to defendant, through a broker, a so-called confirmation, having stamped on it, "Ship sight draft against B/L," a departure from the usual terms, this amounted to a counter offer on new terms, and by defendant's repeatedly recognizing, in subsequent letters to seller, the existence of a contract between it and the seller, such altered terms were accepted by defendant.

**2. Sales ⊜⇒384(7)—Seller held to have right to resell.**

Where defendant buyer rejected sugar in August, and seller stored it in a warehouse and resold it in November, seller *held* entitled to recover the difference between the contract and resale price, whether or not title had passed at time of resale.

**3. Sales ⊜⇒334—Seller may resell at any time while default continues.**

Under Virginia law, on buyer's default, if seller elects to resell, he is not bound to make such election immediately after vendee's default, but may do so at any time while the default continues.

In Error to the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Action by Frederick H. Howell and others, doing business under the firm name of B. H. Howell, Son & Co., against the Gilbert Grocery Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

J. Field Wardlaw and A. R. Long, both of Lynchburg, Va. (Harrison, Long & Williams and Wilson, Manson, Hobbs & Wardlaw, all of Lynchburg, Va., on the brief), for plaintiff in error.

S. V. Kemp, of Lynchburg, Va. (Kemp, Barksdale & Abbot, of Lynchburg Va., on the brief), for defendants in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. This is one of the many sugar cases with which, since August, 1920, the courts have been called upon to deal. In what is here said, it will be convenient to refer to the parties by the position they occupied below; that is, the defendants in error will be called the plaintiffs, and the plaintiff in error the defendant. The former are citizens of New York, trading under the firm name of B. H. Howell, Son & Co. They were, at the time the controversy arose, extensive dealers in sugars, as they had been for many years before. The defendant was a corporation of Virginia, carrying on the business of a wholesale grocer at Lynchburg. For a decade or more, it had been a regular customer of the plaintiffs. Its orders for sugar were usually given through the plaintiffs' only representative in Lynchburg, a merchandise broker named Lee. The terms of payment, 2 per cent. off for cash in seven days, had been unchanged for years, and the defendant, in ordering sugars, never said anything about them. On July 12, 1920, there were still unfilled orders for sugars of an aggre-

gate price of upwards to $9,000. On that day, defendant gave Lee orders for two more cars, the price of which, at the stipulated figure of 22 cents a pound, was approximately $30,000. Lee, as was his practice, put these orders in quintuplicate, upon the regular blanks of the plaintiffs, and sent four of them to the latter, retaining one for his own files. Upon these blanks, as usual, appeared the statement that delivery was complete on receipt of goods by carrier. When the plaintiffs' credit man received these orders, he noticed that the possible or probable effect of filling them upon the terms of payment which had theretofore governed the dealings would be to give the defendant a credit of almost $40,000, when it never before had owed the plaintiffs more than one-fourth of that sum.

[1] It was well understood that no contract was concluded until the plaintiffs had accepted the order sent by the broker. Its acceptance was habitually evidenced by the return to the broker of one of the copies he had sent the plaintiffs. In trade parlance, the one which came back was called the "confirmation." For many years the business relations between the parties had been so much of a matter of course that the broker had not delivered these confirmations to the defendant, or even shown them to it. In the instant case, however, the plaintiffs, before returning the confirmation, stamped on it, "Ship sight draft against B/L," and as this was a departure from the usual terms, the broker, so soon as the so-called confirmation reached Lynchburg, apparently on July 17th or 18th, took it to the defendant and showed it to the president of the latter. That gentleman asked why the plaintiffs had changed the usual terms. The broker did not know. It was suggested that it was unintentional, perhaps a clerical error. The broker said he would write and inquire about it. He apparently did so, but he never had anything more to say about it to the defendant, and, what is more important, the defendant never said another word about it to him. There was no possible question of plaintiffs' right to alter the terms of the order, if they chose, and, of course, equally none of defendant's right to refuse to contract upon the new terms; but, if the defendant exercised this privilege, there was obviously no agreement at all between the parties.

By July 18th the earlier orders had been delivered, and, unless the agreements dated the 12th were in force, the plaintiffs owed no sugar to the defendant. Nevertheless, beginning on August 4th, at least 17 days after defendant had seen the confirmation in the form in which plaintiffs had put it, and continuing up to the 19th of August, there are in the record no less than six letters or telegrams from the defendant to the plaintiffs, each recognizing the existence of a contract between them. The earlier of these urged the prompt shipment of sugars; then followed others asking that the delivery be withheld, and then some which sought to cancel the orders, on grounds now conceded to be insufficient, if a contract had been made at all. It was not until the 25th of August, the defendant for the first time set up the claim that it had never agreed to the altered terms, and that, in consequence, no contract had ever been entered into.

Upon this state of facts, the learned judge below was right in in-

structing the jury that there was a valid contract between the parties, the terms of which were evidenced by the confirmation exhibited to the defendant. There is no pretext that the broker had any power to strike out anything the plaintiffs had put into the confirmation, or that he ever assumed to do so. The confirmation, as it was shown to the defendant, was the contract, or there was none. Defendant thereafter repeatedly recognized that one existed. When market conditions subsequently changed, it could not say that there never was any.

[2, 3] The only remaining question is as to the measure of damages. The defendant took and paid for one car of sugar, and definitely rejected the other, about the end of August. There was, at the time, no demand for sugars in Lynchburg, and no market for them; so plaintiffs put the contents of the car in a storage warehouse in that city, where they remained for a little over two months, until November 1st, when plaintiff, exercising its asserted right of resale, sold them through the broker who had conducted the original negotiations for 11 cents a pound. The new purchaser was the defendant, although it so happened the plaintiffs did not know that fact. The learned judge below told the jury in effect that the plaintiffs had the right to resell the sugar, and if they made reasonable efforts to dispose of it at the best price obtainable, they would be entitled to recover as damages the difference between the contract price and that at which the resale was made.

As the defendant was the purchaser at the resale, no question can arise as to whether the plaintiffs complied with their obligation to give defendant proper notice of their intention to resell. There is evidence in the record that, although at the time defendant rejected the sugar, there was no market for it in Lynchburg, yet some weeks later it could have been sold there. The defendant itself in the latter half of September purchased a carload from some one else at 14 cents a pound. It may be assumed, although there is no occasion so to decide, that at the time of the breach the title of the sugar was still in the seller; but in Virginia, the Uniform Sales Act never having been there enacted, the seller's right to resell and the conditions under which that right may be exercised do not appear to depend upon whether the title had or had not passed. American Hide & Leather Co. v. Chalkley, 101 Va. 458, 44 S. E. 705. In Rosenbaum v. Weeden, Johnson & Co., 18 Grat. (Va.) 795, 98 Am. Dec. 737, it was expressly declared that, if the vendor elects to resell, "he is not bound to make such election immediately after the vendee's default, but may do so at any time while the default continues." It follows that, in the instructions given below, there was no error of which the defendant may complain.

Affirmed.